In the

# United States Court of Appeals
## For the Seventh Circuit

No. 13-3005

ADVANCED TACTICAL ORDNANCE SYSTEMS, LLC,

*Plaintiff-Appellee,*

*v.*

REAL ACTION PAINTBALL, INC., and K.T. TRAN,

*Defendants-Appellants.*

Appeal from the United States District Court for the
Northern District of Indiana, Fort Wayne Division.
No. 1:12-CV-296-JVB — **Joseph S. Van Bokkelen**, *Judge*.

ARGUED JANUARY 7, 2014 — DECIDED MAY 9, 2014

Before WOOD, *Chief Judge*, and POSNER and KANNE, *Circuit Judges*.

WOOD, *Chief Judge*. Some readers of our opinions may be familiar with paintball, a type of war game in which the players shoot charges of paint at one another. Paintballs, it turns out, are not the only kind of nonlethal projectile that can be used in this way. Our case concerns a more serious product, known to Advanced Tactical Ordnance Systems

(Advanced Tactical) by the name PepperBall (a ball filled
with a pepper-spray-like irritant). Police departments, pri-
vate security firms, and comparable organizations are the
primary consumers of these items. This is a trademark in-
fringement action, brought by Advanced Tactical against a
company that calls itself Real Action Paintball, Inc., and its
president, K.T. Tran. (We refer to both as Real Action, be-
cause there is no material difference between the company
and its president for purposes of this appeal.) Although the
parties have focused in their briefs on the preliminary in-
junction the district court granted, we have a more funda-
mental problem with the case. We conclude that the district
court lacked personal jurisdiction over defendant Real Ac-
tion, which preserved its objection on this point. We there-
fore reverse and remand with directions to dismiss on that
basis.

**I**

Advanced Tactical manufactures and sells PepperBall
branded items, including PepperBall projectile irritants. Its
headquarters is allegedly in Indiana, though that is less clear
than it might be—the company appears to have at least one
office in California. It became the manufacturer and seller of
PepperBall-branded items in 2012 after it acquired trade-
marks and other property in a foreclosure sale from a com-
pany called PepperBall Technologies Inc. PepperBall Tech-
nologies Inc. was located in California. Before the foreclo-
sure, PepperBall Technologies had purchased its irritant pro-
jectiles from at least two sources: Perfect Circle, half owner
of Advanced Tactical, and a Mexican company called APON.
After Advanced Tactical acquired PepperBall Technologies,

APON ceased its work as an assembler or manufacturer for PepperBall projectiles.

Around the time of foreclosure, APON's chief operating officer, Conrad Sun, a citizen of California, contacted Real Action Paintball Inc., a California company, to see if Real Action was interested in acquiring irritant projectiles from APON. The answer was yes. The parties concluded their deal in August 2012, after which Real Action posted on its website and sent through its email list an announcement that it had acquired the "machinery, recipes, and materials once used by PepperBall Technologies Inc." That announcement is central to the merits, because it arguably implied that after PepperBall Technologies ceased to exist, Real Action was the only maker of PepperBall irritant projectiles.

Advanced Tactical soon caught wind of Real Action's announcement and fired off a cease-and-desist letter. In response, Real Action added a disclaimer to the original message, stating that it was neither associated nor affiliated with PepperBall Technologies and its brands, and that Real Action projectiles were not made by the current PepperBall Technologies (the name under which Advanced Tactical was doing business). Unsatisfied, Advanced Tactical filed this suit in the District Court for the Northern District of Indiana. It offered a number of different theories of recovery, including intentional violations of the Lanham Act, 15 U.S.C. § 1111 *et seq.*, common law trademark infringement and unfair competition, trade dress infringement, and misappropriation of trade secrets.

The complaint alleged that personal jurisdiction was proper under Indiana's long-arm statute, which is found in Trial Rule 4.4(A). Each defendant, it asserted, engaged in

conduct satisfying one or more of the following: doing any business in Indiana, via an interactive website capable of accepting orders from citizens of Indiana (Rule 4.4(A)(1)); engaging in tortious acts outside Indiana while knowing they would harm citizens of Indiana (Rule 4.4(A)(3)); causing damage in Indiana while deriving substantial revenue from goods sold in Indiana (same); and conspiring to engage in tortious conduct calculated to harm a citizen of Indiana (same). Real Action contested personal jurisdiction. In response to the district court's query why Indiana was proper and why California was not preferable, Advanced Tactical pointed to the "blast email" that Real Action sent to all of its customers, "many of whom are located here in the state of Illinois. I mean, state of Indiana." Advanced Tactical also noted that Real Action regularly emailed customers or potential customers from all over the United States, including Indiana, and that it had made at least one sale to an Indiana resident.

The district court decided that the parties needed more time to look into the question. It held an evidentiary hearing on the matter on December 7, 2012, after which it concluded that personal jurisdiction was proper and that Advanced Tactical was entitled to a preliminary injunction. Real Action has appealed, as it is entitled to do under 28 U.S.C. § 1292(a)(1), contesting both the personal jurisdiction ruling and the injunctive relief.

## II

The plaintiff bears the burden of establishing personal jurisdiction. *N. Grain Mktg., LLC v. Greving*, 743 F.3d 487, 491 (7th Cir. 2014) (citing *Purdue Res. Found. v. Sanofi–Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003)). When the district

court holds an evidentiary hearing to determine personal jurisdiction, as it did here, "the plaintiff must establish jurisdiction by a preponderance of the evidence." *Purdue*, 338 F.3d at 782 (citing *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 713 (7th Cir. 2002)). Advanced Tactical, however, urges first that the question of personal jurisdiction is not properly before us on this interlocutory appeal; Real Action responds that we can reach it through pendant appellate jurisdiction. Both parties are wrong; this court is entitled to entertain a threshold non-merits question, such as personal jurisdiction, at the outset of a case. See *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999) ("Personal jurisdiction … is an essential element of district court jurisdiction, without which the court is powerless to proceed to an adjudication."). Although personal jurisdiction is the kind of limitation that is waivable, that is of no moment in a case like this one, in which the objection has been fully aired.

In order for the district court's preliminary injunction to be valid, that court had to have personal jurisdiction over the defendant. Accord *e360 Insight v. The Spamhaus Project*, 500 F.3d 594, 598 (7th Cir. 2007) ("Default judgments rendered without personal jurisdiction are void and, therefore, we shall 'set aside a default judgment as a *per se* abuse of discretion if the district court that entered the judgment lacked jurisdiction.'") (citing *Swaim v. Moltan Co.*, 73 F.3d 711, 716 (7th Cir. 1996)). Indeed, as both parties seem to acknowledge, our decision in *Indianapolis Colts, Inc. v. Metro. Balt. Football Club Ltd. P'ship*, 34 F.3d 410 (7th Cir. 1994), is precisely on point. There we reviewed a preliminary injunction, and the main argument concerned personal jurisdiction. We therefore proceed to that issue.

### III

This case involves claims under both federal law (the Lanham Act) and state law, and so the district court's jurisdiction rested on a federal question, 28 U.S.C. § 1331, and supplemental jurisdiction, 28 U.S.C. § 1367. Because the Lanham Act does not have a special federal rule for personal jurisdiction, however, we look to the law of the forum for the governing rule. See FED. R. CIV. P. 4(k)(1)(A); *Daimler AG v. Bauman*, 134 S. Ct. 746, 753 (2014). Under Indiana's long-arm statute, Indiana state courts may exercise personal jurisdiction on a number of prescribed bases, as well as "on any basis not inconsistent with the Constitution of this state or the United States." IND. R. TRIAL P. 4.4(A). The Supreme Court of Indiana has held that Indiana's long-arm provision "reduce[s] analysis of personal jurisdiction to the issue of whether the exercise of personal jurisdiction is consistent with the Federal Due Process Clause." *LinkAmerica Corp. v. Cox*, 857 N.E.2d 961, 967 (Ind. 2006). Thus, to determine whether the district court had personal jurisdiction over Real Action, we ask whether "the exercise of jurisdiction comports with the limits imposed by federal due process." *Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014) (internal quotation marks omitted).

In *Daimler,* the Court confirmed its adherence to the distinction between "general jurisdiction" and "specific jurisdiction." The former is proper only in the limited number of fora in which the defendant can be said to be "at home." For a corporation, such places include the state of incorporation and the state of the principal place of business. Specific jurisdiction is available for a suit that arises out of the forum-related activity. Advanced Tactical concedes that it cannot

rely on general jurisdiction; it must prove specific jurisdiction or face dismissal. We thus confine the discussion that follows to the law governing specific jurisdiction.

Nearly 70 years ago, the Supreme Court held that due process is satisfied for this purpose so long as the defendant had "certain minimum contacts" with the forum state such that the "maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). *Walden* serves as a reminder that the inquiry has not changed over the years, and that it applies to intentional tort cases as well as others. See *Walden*, 134 S. Ct. at 1119.

The relevant contacts are those that center on the relations among the defendant, the forum, and the litigation. *Id.* (citing *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 775 (1984)). Crucially, not just any contacts will do: "For a State to exercise jurisdiction consistent with due process, the defendant's *suit-related* conduct must create a substantial connection with the forum State." *Id.* at 1121 (emphasis added). The "mere fact that [defendant's] conduct affected plaintiffs with connections to the forum State does not suffice to authorize jurisdiction." *Id.* at 1126. Furthermore, the relation between the defendant and the forum "must arise out of contacts that the 'defendant *himself*' creates with the forum … ." *Id.* at 1122 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)). Contacts between the plaintiff or other third parties and the forum do not satisfy this requirement. *Id.*; see *Walden*, 134 S. Ct. at 1122.

Here, the district court found the necessary minimum contacts based on several facts: first, Real Action fulfilled

several orders of the allegedly infringing projectiles for pur-chasers in Indiana; second, it knew that Advanced Tactical was an Indiana company and could foresee that the mislead-ing emails and sales would harm Advanced Tactical in Indi-ana; third, it sent at least two misleading email blasts to a list that included Indiana residents; fourth, it had an interactive website available to residents of Indiana; and finally, it put customers on its email list when they made a purchase, thereby giving the company some economic advantage. In our view, none of these meets the standards that the Su-preme Court has set.

While it is true that Real Action fulfilled a few orders af-ter putting the allegedly infringing message on its website and in emails, Advanced Tactical provides no evidence that those sales had any connection with this litigation. We do not know, for example, whether the Indiana residents saw Real Action's post before making their purchases. There is also nothing to suggest that any Indiana purchaser thought that Advanced Tactical had started selling PepperBalls. Looking at the over 600 sales that Real Action allegedly made to Indiana residents in the two years before suit was filed does not help matters. Specific jurisdiction must rest on the *litigation-specific* conduct of the defendant in the pro-posed forum state. The only sales that would be relevant are those that were related to Real Action's allegedly unlawful activity. Advanced Tactical—which has the burden of proof here—has not provided evidence of any such sales.

Not only did Advanced Tactical fail to link the few sales to Real Action's litigation-specific activity, but even if it did, it is unlikely that those few sales alone, without some evi-dence linking them to the allegedly tortious activity, would

make jurisdiction proper. See *Calder v. Jones*, 465 U.S. 783 (1984). To hold otherwise would mean that a plaintiff could bring suit in literally any state where the defendant shipped at least one item. The creation of such *de facto* universal jurisdiction runs counter to the approach the Court has followed since *International Shoe*, and that it reaffirmed as recently as February 2014 in *Walden*. See also *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2851 (2011).

The district court also thought personal jurisdiction proper because Real Action knew that Advanced Tactical was an Indiana company and could foresee that its misleading emails and sales would harm Advanced Tactical in Indiana. *Walden*, however, shows the error of this approach. There the defendant knew that the plaintiffs were going to Nevada, and it was foreseeable that they would want the use of their money there, but the Court squarely rejected this as a permissible basis for jurisdiction. The "mere fact that [defendant's] conduct affected plaintiffs with connections to the forum State does not suffice to authorize jurisdiction." *Walden*, 134 S. Ct. at 1126. The relation between the defendant and the forum "must arise out of contacts that the 'defendant *himself*' creates with the forum State." *Id.* at 1118 (quoting *Burger King*, 471 U.S. at 475).

The question whether harming a plaintiff in the forum state creates sufficient minimum contacts is more complex. Compare *Wallace v. Herron*, 778 F.2d 391, 394 (7th Cir. 1985) ("We do not believe that the Supreme Court, in *Calder*, was saying that any plaintiff may hale any defendant into court in the plaintiff's home state, where the defendant has no contacts, merely by asserting that the defendant has committed an intentional tort against the plaintiff.") with *Janmark, Inc. v.*

*Reidy*, 132 F.3d 1200, 1202 (7th Cir. 1997) (finding that "there can be no serious doubt after *Calder* [] that the state in which the victim of a tort suffers the injury may entertain a suit against the accused tortfeasor") (citing *Indianapolis Colts*, 34 F.3d at 411–12). Although those two cases may be in some tension with one another, after *Walden* there can be no doubt that "the plaintiff cannot be the only link between the de-fendant and the forum." *Walden*, 134 S. Ct. at 1122. Any deci-sion that implies otherwise can no longer be considered au-thoritative.

The district court also considered Real Action's online ac-tivities—the sending of two allegedly misleading emails to a list of subscribers that included Indiana residents and the maintenance of an interactive website. The Supreme Court has not definitively answered how a defendant's online ac-tivity translates into "contacts" for purposes of the "mini-mum contacts" analysis. To the contrary, it expressly "le[ft] questions about virtual contacts for another day" in *Walden*. *Id.* at 1125 n.9. We have faced that problem on several occa-sions, however, and thus far it has appeared to us "that the traditional due process inquiry [] is not so difficult to apply to cases involving Internet contacts that courts need some sort of easier-to-apply categorical test." *Illinois v. Hemi Grp. LLC*, 622 F.3d 754, 759 (7th Cir. 2010) (citing *Jennings v. AC Hydraulics A/S*, 383 F.3d 546, 550 (7th Cir. 2004) ("[A]lthough technological advances may alter the analysis of personal jurisdiction, those advances may not eviscerate the constitu-tional limits on a state's power to exercise jurisdiction over nonresident defendants.")); see also *Tamburo v. Dworkin*, 601 F.3d 693, 703 n.7 (7th Cir. 2010) (declining to endorse a spe-cial jurisdictional test for internet cases). Thus, "[o]ur inquiry boils down to this: has [defendant] purposefully exploited

the [Indiana] market" beyond simply operating an interactive website accessible in the forum state and sending emails to people who may happen to live there? *be2 LLC v. Ivanov*, 642 F.3d 555, 558–59 (7th Cir. 2011). Has the defendant, in brief, targeted Indiana somehow? *Id.*

The fact that Real Action maintains an email list to allow it to shower past customers and other subscribers with company-related emails does not show a relation between the company and Indiana. Such a relation would be entirely fortuitous, depending wholly on activities out of the defendant's control. See *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291–92 (1980). As a practical matter, email does not exist in any location at all; it bounces from one server to another, it starts wherever the account-holder is sitting when she clicks the "send" button, and it winds up wherever the recipient happens to be at that instant. The connection between the place where an email is opened and a lawsuit is entirely fortuitous. We note as well that it is exceedingly common in today's world for a company to allow consumers to sign up for an email list. We are not prepared to hold that this alone demonstrates that a defendant made a substantial connection to each state (or country) associated with those persons' "snail mail" addresses. *Cf. Burger King*, 471 U.S. at 478 (contracting with an out-of-state party alone cannot establish automatically sufficient minimum contacts in the other party's home forum.). It may be different if there were evidence that a defendant in some way targeted residents of a specific state, perhaps through geographically-restricted online ads. But in such a case the focus would not be on the users who signed up, but instead on the deliberate actions by the defendant to target or direct itself toward the forum

state. Advanced Tactical introduced no such evidence in the district court and makes no such argument on appeal.

The interactivity of a website is also a poor proxy for adequate in-state contacts. We have warned that "[c]ourts should be careful in resolving questions about personal jurisdiction involving online contacts to ensure that a defendant is not haled into court simply because the defendant owns or operates a website that is accessible in the forum state, even if that site is 'interactive.'" *be2 LLC*, 642 F.3d at 558 (citing *Illinois v. Hemi Grp., LLC*, 622 F.3d 754, 760 (7th Cir. 2010)). This makes sense; the operation of an interactive website does not show that the *defendant* has formed a contact with the forum state. And, without the defendant's creating a sufficient connection (or "minimum contacts") with the forum state itself, personal jurisdiction is not proper.

Even if we assume that interactivity matters at least in an evidentiary way, it is unclear how any interactivity of the website here affected the alleged trademark infringement. Real Action posted a notice (by itself not interactive) on its website; that notice allegedly infringed Advanced Tactical's trademark. But whether the notice amounted to infringement has nothing to do with interactivity. We need not belabor the point: if having an interactive website were enough in situations like this one, there is no limiting principle—a plaintiff could sue everywhere. Such a result would violate the principles on which *Walden* and *Daimler* rest. Having an "interactive website" (which hardly rules out anything in 2014) should not open a defendant up to personal jurisdiction in every spot on the planet where that interactive website is accessible. To hold otherwise would offend "tradition-

al notions of fair play and substantial justice." *Int'l Shoe*, 326 U.S. at 316.

**********************

In sum, we see no evidence that the defendant, Real Action, has the necessary minimum contacts with Indiana to support specific jurisdiction. We REMAND the case with instructions to vacate the judgment and dismiss the complaint for lack of personal jurisdiction.